May it please the Court, Nicholas Dronias and my colleague Christina Sandifer on behalf of the historic and culturally significant City of Tombstone. Your Honors, this interlocutory appeal raises a fundamental question. Does the City of Tombstone have any right to exist under the Tenth Amendment? The lower court abused its discretion and committed reversible error by deliberately issuing conclusory rulings that disregarded the clear irreparable harm facing Tombstone, that disregarded the overwhelming weight of public interests and equities that favored the City of Tombstone's requested preliminary injunction, and the very serious questions going to the merits of the Tenth Amendment claims advanced by the City of Tombstone. Let me ask you this. We have Kleppe, I guess, and the Supreme Court stated that the federal government's authority under the Property Clause is without limitations. Has the Court, meaning the Supreme Court, ever given any indication that the Tenth Amendment limits the Property Clause specifically? Not yet, Your Honor, but all other plenary clauses just about now have been recognized as limited by the principle of state sovereignty. In Bond, we saw the Court allowing a Tenth Amendment claim to proceed against the treaty power. In National Federation of Independent Businesses, most recently in June, we saw a state sovereignty claim on Prince and New York go forward against it. But they're all a little bit different in that, I mean, this is property that the federal government owns. And do you agree that that is a little bit different? Well, respectfully, Your Honor, no. Actually, because of the fact that Kleppe recognizes concurrent jurisdiction over this property, and in fact goes out of its way to say that a standard preemption analysis would apply. And what's significant about this case and relevant directly both to the balance of harms and public interests and to the serious questions under the Tenth Amendment is the fact is that there is no clear facial conflict between any federal law and what the City of Tombstone is proposing. All the federal laws at issue in this case are perfectly consistent with the work that the City of Tombstone would like to perform. Let me be sure I understand the City's claim to whatever rights are at stake here. I assume it goes back to the 1800s and, most recently, the 1962 permit, which allows the City to have access to these wells and perhaps also to build, construct facilities and pipes and so forth to take the water. Is that correct? That's correct, Your Honor. Is there anything else that is at stake here? Your Honor, one of the interesting facts about the conclusory decision rendered by the lower court is it completely disregarded the 1916 letter from the Forest Service recognizing, in a letter determination, the fact that the City had acquired under the 1866 Mining Act rights of way to the pipeline throughout the forest. And that was against the backdrop of having considered the 1908, later approved 1913, survey of about 4 foot by 6 foot, which contains the pipelines to just about everything except Marshall Canyon in Tombstone. So I assume that the City probably owns the pipelines but has no property interests, so to speak, other than access as far as the surface land is concerned? Well, respectfully, Your Honor, the unrebutted testimony, again, not addressed by the conclusory opinion of the lower court, of our archivist and historian, Nancy Sosa, points out that customarily pertinent and bundled with the water rights were possessory interests of approximately 5 acres. We believe that's an amalgam of the mining laws that applied at the time in the 1880s. But regardless, the 1866 Mining Act incorporated local law and custom in defining the scope of water rights, and they clearly included possessory interests. And what's at stake at the moment, I gather, is we've now had the Wilderness Act, which covers this area, and under the provisions or regs under that, no motorized vehicles are allowed into this area. Is that kind of where we are at the moment, and that's what you're challenging? Respectfully, Your Honor, that is a conclusory determination of the lower court, because the lower court didn't make any specific findings as to the location of either the wilderness area relative to our springs or the location of the springs themselves. Instead, it relied on defendants' testimony that they couldn't locate the springs. Your Honor, respectfully, the fact that the defendants couldn't rely on well-established, recognized surveys to locate these springs only attests to their incompetence. It does not constitute proof that these are not locatable. And because of the conclusory decision of the lower court, we don't even have any assessment of the merits or the usefulness of the surveys that are of record. One last question. The government's position is that you still have the right of access, but you can't use motorized vehicles. Am I reading that incorrectly or not? Well, their position is that we can hike up there carrying on our backs hand tools to repair springs that were wiped out by massive monsoons and buried in as much as 12 feet of mud, despite the fact that between 1969 and to about 2004, we have unrefuted testimony from five independent witnesses that it was a consistent practice of using heavy equipment, including backhoes, to regularly repair this property in response to monsoons, which are periodic, very much like this one. Well, but you said, Grant, I'm sorry. I'm sorry. One last question. Is the question before us, then, the impact of the Wilderness Act, or is it are you telling us that there was never any finding that this particular area was subject to the Wilderness Act? Is that your position? Your Honor, it is that. It is twofold. First, there is no specific finding justifying the lower court's determination that we're cutting through a wilderness area. There's no finding as to the location of the wilderness area. There's no finding as to the location of our rights-of-way relative to the wilderness area. All of this violates Rule 52a. However, we can also consider the Court's ruling as erroneous on the grounds that the wilderness area specifically contains provision that yields to the purpose of the Organic Act that established the national forest, which the U.S. Supreme Court said in New Mexico v. United States is, quote, principally aimed at allowing for the development and use of water by the settlers of the arid west. And so if we look at this from the balance of the public interests and equities, we see that what Tombstone is proposing is exactly what both the Organic Act establishing the national forest and the Wilderness Act was meant to preserve, the principal purpose of developing and using that water for the quintessential settlement of the arid west. Judge Callahan, I'm sorry. I didn't mean to interrupt you. That's okay. Well, it seems to me that on certain things where you've satisfied with their permitting requirements, you've been allowed to do it. But you're complaining to some extent about that. Is that correct? Well, Your Honor, again, with the conclusory decision of the lower court, it's impossible to know what regulations as opposed to laws are at issue. But be that as it may, what's particularly disturbing about what the Forest Service is doing is they've only allowed us to restore three springs, even though they're 1962 special use permit, which contains surveys, allows for the construction of rights of way and spring drawing from six springs at five different parcels. And yet we didn't even – weren't even granted injunctive relief as to what was allowed explicitly by the undisputed 1962 special use permit. In effect, the Forest Service is taking the position that we need to seek a permit to use the rights that we already have recognized under a special use permit, and that we need – and furthermore, they are causing irreparable harm to our sovereign interests, very much like in Kansas v. United States, by virtue of the fact that they've completely disregarded their own 1916 letter determination recognizing our entire pipeline and related reservoirs under the 1866 Mining Act without notice or an opportunity to be heard. Well, I guess so. I'm wondering, now, if we agree with you that the Tenth Amendment limits the property clause, wouldn't the relevant test be that whether the government, the Federal Government is engaging in regulatory commandeering? Would that be the relevant test, if we agree with you? Your Honor, respectfully, that would be one of the tests. There are at least two tests. That test would be the test articulated in Prince in New York, which we've now learned in National Federation of Independent Businesses also stands for the proposition that Congress cannot indirectly coerce the States when they're acting within the scope of their traditional functions of government. So we are beyond simply the concrete bound that Congress cannot command action either by an executive agent or the legislative agent of the State. We are now, according to the latest Supreme Court precedent, in a position where the underlying principle that the Federal Government may not directly regulate the States has been recognized as what drove that decision. Well, let me ask you this, though. I mean, how exactly is the Forest Service infringing on State sovereignty? It's not telling the City where to get its water or how to distribute it, and it's not requiring the City to enforce Federal law. Isn't the Forest Service regulating Tombstone as it would any other permittee? The short answer is absolutely not, Your Honor, respectfully. Because of the state of emergency declared by the Governor, which was the basis of a $50,000 grant and under administrative rules and statute clothed Tombstone, deputized Tombstone with a full police power authority of the State to restore this property, the City of Tombstone's efforts are not merely proprietary. They are, in fact, the full weight and authority of the State in its exercise of police powers being interfered with by the Forest Service in a circumstance where there is no clear and unequivocal command from any applicable law that they do so.  And I would like to draw the Court's attention to the fact that the Federal Government has a right to do that. What does the Federal Government have a right to do? What does it have a right to do on its own property? It sounds to me like they should just let you do whatever you want. Respectfully, that is not at all what we're requesting. What we're asking for at page 50 and 51 of our appellant's brief is simply to restore our water supply to the original specifications in the surveys which the lower court's conclusory ruling did not even address. And so we're not asking to do whatever we want. We want to do what we have the right to do that the Forest Service recognized we had the right to do in 1916 and in their 1962 special use permit. Respectfully, Your Honor, I'd like to reserve, if I could, the balance of my time for rebuttal. You may do so, Counsel. You have 9 minutes and 15 seconds. We'll hear from the Government. May it please the Court. I am David Shulton, here representing the United States. I want to first emphasize that this is, of course, a preliminary injunction appeal. And since a preliminary injunction is an extraordinary remedy, the plaintiffs did have the burden of showing all of the prerequisites for such relief. The district court carefully went through the prerequisites. Its decision is not conclusory. It explained why the plaintiff has raised no serious questions, let alone a likelihood of success. It went to irreparable harm and found that there was no irreparable harm because the city's water system into these mountains has been substantially restored because the Forest Service allowed it to do work with motorized equipment where that was appropriate, where the city had appropriately applied, and told the Forest Service what it wanted to do with regard to Miller Spring and Gardner Spring through the Chief Springs. So it got its water system substantially restored, so there was no irreparable harm. On the other hand, the equities tipped strongly towards the Forest Service and the public because this is a wilderness area and taking heavy motorized equipment. Let me just stop you right there. I take it then you dispute the representation made by your opposing counsel that there was no finding that this was a wilderness area. Oh, we do. It's been undisputed that the Chief. It's not disputed in oral argument today. Yeah. That's the first I've heard that these – there are six springs that are subject  to the Forest Service, but the main ones, Miller and Gardner and Carr, are in the wilderness area. Is there a finding to that effect in the record of this case so far? Not in the district court's order because I don't think it was disputed, but it's assumed, I think, throughout the record. And in the approvals that the Forest Service gave for the work at Miller Spring and Gardner Spring, it's clear that the Forest Service was acting pursuant to the Wilderness Act 16 U.S.C. 1311C, which requires the Forest Service to make a minimum requirements decision when someone asked to use motorized or mechanical vehicles in the wilderness. And so that whole process assumed that these areas are in the wilderness area, and they clearly are. And if it is established that these springs are now within the wilderness area, which they were not in 1962 when the latest permit was issued, do we have to make a determination that the Wilderness Act trumps the permit and whatever property rights the city had in this permit? No, because even if the Wilderness Act were not there, the city would have to ask permission to do reconstruction. That's in its special use permit itself. In the 1962 permit, one of the conditions, the permit allows the city to maintain a water system, but if the city wants to reconstruct any part of it or do new construction, it has to seek permission from the Forest Service. So even if it wasn't in the wilderness area, the city would have to come to the Forest Service for permission. But the wilderness overlay is important. The Wilderness Act does recognize valid existing uses. And the Forest Service recognizes that the city, before the Wilderness Act, did have a water system to the springs that are mentioned in the special use permit. And that's why it found in these two decisions that it was appropriate to allow the city, under appropriately protective conditions, to use mechanized equipment to repair its systems. So where's the dispute then? I guess I thought the dispute was over the use of motor vehicles to gain access to these springs. Am I wrong? It seems like the dispute has now focused on additional springs, springs that are not subject to the special use permit. Sort of in the middle of this process, while the Forest Service was considering the request to access the springs that are part of the special use permit, the hand-drawn 1901 map that mentions 25 springs. And the Forest Service basically said, well, we're willing to consider other work, but you've got to come to us and let us know exactly what you propose to do with these springs and show us some indication that you have some right to take the water from these springs. Because there are other users in this area. And that's when the city said, you know, we should have unrestricted right. Are there other municipal systems in this area? No municipal systems, but there is a private landowner in the area who also has a special use permit to use water. So the Forest Service has to balance a number of considerations here, the right of the public to a natural area, the right of the private landowners, and the right of the city under its special use permit. So things broke down when the city was, from your perspective, when the city was not able to provide what the right was to those areas and follow your permit process. That's correct. Do we need to get to the Tenth Amendment here? I don't think you do. This is, as the district court found, this is simply an instance of the Federal Government regulating on Federal property. It really doesn't raise any issue of the Tenth Amendment because there's no commandeering of the State Government. And it's simply that the Forest Service is doing here what it would do to any person who has some sort of special use permit on the Forest Service land, especially land in a wilderness area. Anyone would have to come to the Forest Service with plans for reconstruction to make sure that the plan is appropriate for the area and fits the Wilderness Act restrictions. The Wilderness Act is very strict about use of mechanical and motorized vehicles. It's generally banned except where it's required for the minimum, for administration minimum requirements of the area. So the Forest Service has to make a finding under that section before it can allow motorized or mechanical use. And it did so with regard to those two instances where the city, you know, described what it was going to do. The city was also able to clean out one of the other springs, car springs, with hand equipment because there was very little damage there. And it can use, you know, hand equipment in other places as long as it's consistent with a special use permit. But it can't simply go up into this area and use bulldozers or dump trucks and whatever at will because that would be inconsistent with the Wilderness Act and inconsistent with the other statutes that govern Forest Service land. Scalia, you can comment on this. Well, counsel, you heard counsel say that they've been doing this for years, until recently, until this issue developed. What don't we have to then examine whether the Wilderness Act trumps their permit rights? In other words, it takes away the property right they have to develop their water system? Well, it's very sharply disputed that they've done this sort of thing for years. I would point the Court to the declaration of Dwayne Barrett from the Forest Service, who says he did a careful check of the records and found, you know, no instances where they'd used this sort of heavy equipment before. But be that as it may, I think that in order to properly present a claim that the Wilderness Act or is not recognizing rights that it should under the Wilderness Act, the city, I think, would have to proceed under the Administrative Procedure Act. It would have to get a final agency action that denied it some permission and challenged that. But as the district court found here, the city didn't do that. The city didn't focus on any final agency action that consummated an administrative process. In fact, the two administrative processes there were ended up with approvals. But then the city just said, well, we think we can go up there on our own. And the Forest Service said, no, you need to submit us an application. But that's not a consummation of an agency decision-making process. And so the city in its appellate briefs has not challenged the district court's holding that they didn't raise any serious questions under the Administrative Procedure Act because they didn't point to any final agency action. So that would be the way that the city would properly bring a claim that the Forest Service was improperly interpreting the Wilderness Act to take away rights. The city also brought Quiet Title Act claims, basically saying, well, we have an adverse property interest to the United States. We own a right that allows us to take this equipment up there freely. And the district court properly said, that has to be brought consistent with the Quiet Title Act. And the Quiet Title Act specifically says that no preliminary injunction shall be granted. It's part of the limited waiver of sovereign immunity, that Congress didn't want anyone to get a preliminary injunction based on a claim of title until that title  So that certainly was not an abuse of discretion. And then their only other claim was the Tenth Amendment claim. Well, let me ask you. Does the United States concede that the Tenth Amendment imposes limits on the government's authority under the property clause, or at least in this case? No. All of the cases have indicated that where there's a specific delegation to Congress, and that certainly describes the property clause, that that's not, you know, a Tenth Amendment area, that there are no limitations. And the Supreme Court's cases, going back to the city of San Francisco case, which has a lot of similarities here, it was another water project in a national park and national forest, the Hetch Hetchy project. And the city said, you know, Congress has no business telling us how to distribute power, and the Supreme Court said Congress is acting under the property clause here, and its power there is plenary. It's without limitations, and there's no ---- But, of course, the Supreme Court has applied the Tenth Amendment to other congressionally enumerated powers, like the Commerce Clause. So is the property clause special? Well, in those, you know, the Commerce Clause can apply in situate ñ well, it's applied in situations where the federal government essentially has been telling the state that it has to regulate in a way that regulates for the federal government. And it's very hard to see how Congress could do that with respect to federal property. It's almost inconceivable. So I think that's why, you know, you don't see any cases which have found that the property clause is limited by ñ It is. Yes, I think that's correct. And in New Mexico v. Kleppe, I mean, Congress went quite a bit further in that case than anything we're talking about here. There were New Mexico laws, stray laws, which, you know, had controlled wild horses and burros, and Congress basically said, no, on federal lands, we're going to displace those laws. Here, Congress isn't displacing any laws with the Wilderness Act as it applies to federal property. There were never any state laws that, you know, applied to wilderness on federal property. And state water law still applies. Congress has not displaced state water law. The city filed, you know, its claims to springs in the state proceeding, and the state proceeding is going along. It's not affected by this, but I think it is very relevant that when the city filed its claims in the 1980s, it only filed with respect to the springs that are part of the special use permit, not these 20 other springs that it is now claiming. It has only, in the last year, filed additional claims with regard to those. All right. Well, it is a preliminary injunction, but the district court, in looking at the equities under Rule 52, it just limited it to one paragraph. So it wasn't exactly, you know, an extensive discussion. So is it enough? Yeah. I think it is enough because it was to the point. And the main point that it made was that the city's water system into the mountains has been substantially restored, which is absolutely correct. Water was flowing by the time of the preliminary injunction, and that really dissipated any irreparable harm claim that the city may have had. It also noted that the claims of an emergency were overstated and speculative. And that's just shown by the nature of the city's arguments, which are basically that, you know, like every city would like to have more water capacity, but it certainly has enough now with the water flowing to handle its needs. So I think the district court said enough. And with respect to the equities weighing on the other side, the court pointed out, well, that the city, while the applications, the two applications were pending in the fall of 2011 before the Forest Service, went ahead at one point and sent bulldozers into the wilderness area without permission. Forest Service told them to cease and desist. But there was evidence from that occasion, and this again is in the Duane Barrett declaration, that that did quite a bit of damage to these sensitive stream areas. And so I think the district court was well warranted in finding that driving bulldozers and such into a wilderness area would be contrary to the public interest and would harm the Forest Service. When did the wilderness determination take effect? What year? 1984 was when Congress designated the- And you indicated that there was some preexisting use protection. How is that manifest? Is it an amendment to the permit? Is it some sort of general regulation? What is it? Well, the Forest Service regulations do make allowance for what they call valid occupancies. And these are mentioned in the two approvals that the Forest Service granted for the use in the wilderness. They cite that regulation for valid occupancies, which the city has. Your position is that their right to use motorized vehicles was protected in those documents? Well, no. The valid occupancy is to maintain a water system. But to get the right to use motorized vehicles, they have to get a specific permission. So there's nothing in the- I thought you said earlier in your presentation that preexisting motorized rights were allowed. Did I misunderstand that? No. The special use permit allows them to maintain the water system, but it doesn't say anything about motorized vehicles. It does say that if they want to do reconstruction, they have to get permission. Then you have the Wilderness Act comes along in 1984. And so after that, if the city wants to use motorized vehicles, they have to go to the Forest Service for permission. But the Forest Service will consider the fact that the city has had this water line in place before the wilderness. But that doesn't give the city any carte blanche right to use motorized access. Now, the Forest Service will consider the fact, and they did here, that the city had used four-wheel drive pickup trucks to access these before the wilderness designation. And so they can do that. And that would be an exception which the Forest Service would allow. Is that what you're telling us in the open court? Right. On a case-by-case basis, the Forest Service allows that if they find that that sort of thing was done before the Wilderness Act. And if it's appropriate and consistent with their other statutory responsibilities, the Forest Service is also subject to the Endangered Species Act. It has to make sure that whatever it's allowing to happen there does not, you know, jeopardize species. So it's got to take a look at that. So basically our position is, you know, the Forest Service has to have a chance to look at all the facts and on a case-by-case basis decide whether a particular use of motorized vehicles is appropriate. You're saying now in open court that there has been no order by the Forest Service banning the use of motorized vehicles to have access to these wells. Well, no such order banning. But it is the Forest Service's position that the statute bars that unless the Forest Service makes a determination under 1133C that the motorized vehicle use is necessary to meet the minimum requirements for administering the area. So the city has to apply, show the Forest Service its plans. The Forest Service determines then whether that. Are you saying the city never asked for the right to continue using their motorized vehicles to have access to this area? No, they did twice, for Miller Spring and Gardner Spring, and on both those occasions the Forest Service. Well, then you must have rejected that request. That was my question to you. No, those requests were granted. That's how the system got fixed. In the fall of 2011, the city first came to the Forest Service with an application for Miller Spring, which is the main spring, asked can we use motorized equipment. The Forest Service said, you know, let us know your plans and we'll evaluate it. And within about two and a half weeks, the Forest Service came back after doing NEPA, ESA, and said yes, you can use motorized equipment in Miller Spring. A couple of weeks later they came with another one for Gardner Spring. And the same thing happened. They gave permission for them to use motorized equipment. It was conditioned. They had to finish by March 1st because that's when the breeding season starts for Mexican spotted owls. But it was after that that the city said, well, actually what we want is blanket permission for all 25 springs. That's where things broke down. And that's what's in front of us in this case. Is that what you're saying? Exactly, exactly. One last question. Your time has expired, but what is the status of the ongoing litigation here? As you point out, this is a PI. What's going on back in court? The United States moved to dismiss in May. The district court denied that without prejudice, finding that there was a need for factual development on jurisdictional issues, and so authorized jurisdictional discovery. And that discovery is ongoing now. Fine. Thank you, counsel. Another question? Yes. May I have permission to ask? Absolutely. I seem to understand appellant's counsel to say that they have some possessory interest in the land. Did I understand that correctly? That is their position, I believe. Yes. All right. And your position to that was that was disputed as part of the preliminary injunction, and obviously the court must have not found that possessory interest or? Right. That possessory interest is the basis of their Quiet Title Act claim, and the district court is going to resolve that, but the district court found that you cannot get a preliminary injunction under the Quiet Title Act because the act says so on its face. All right. Thank you. Thank you, counsel. Mr. Verries, you have quite a lot of reserved time. Thank you, Your Honor. May it please the Court. And I have to clarify a misstatement of the record that you've just heard from appellant's counsel. Appellant's counsel just stated that it was after March that the City of Tombstone made its request for authorization to fully and freely restore all of its springs. That is not true. The court can take a look at the record at ER 120 and see that on December 5th, a letter was written. What year? 2011. A full four months before what counsel just represented was done. I didn't understand that's what he said. I thought that after March what he was saying was when they did grant a permit, that you had to get it done before March. Your Honor, respectfully, perhaps I misheard, but my notes indicate that counsel just represented, and I'm sure the recording will indicate who is correct, that it was after the spotted owl breeding season began in March that the first time that the City of Tombstone asked for blanket permission to do it. No, I think what he said was that it had to terminate in March because of the spotted owl breeding season, that they had to get the work done by March. Okay. Well, then allow me to clarify. The record will be what it is. We don't need to fight about when you did it, I think. Unless you think it's critical. Well, if I may, real briefly. The reason why this is significant is there is, again, if we look at ER-120, there is no question the City of Tombstone, after having furnished the Forest Service with all of the evidence concerning its surveys, its ancient water rights, its rights of way, requested the right to use its rights, which is protected under all the laws at issue in this case. And in response, the Forest Service didn't give them that right. Instead, they ignored it and gave them only limited restoration rights or permissions for Gardner Spring. Bruce, I don't think you're in disagreement with your opposing counsel on this point. Okay. Well, it was 1.01. I'd like to highlight and clarify. The other point, Your Honor, if I may. Well, it would be very helpful if you would zero in on precisely where this confrontation exists. We now heard from counsel. I didn't hear it from you, but I did hear from counsel that you got two specific rulings in your favor from the Forest Service allowing you motorized access. Is he misrepresenting the record or not? Your Honor, the devil's in the details. We received authority to do what we are already authorized to do under the 1962 special use permit. That's not that great of a victory.  I think that's the whole thing. You were granted twice, and now your position is we don't need to seek a permit, and we're not going to do what you want us to do because we have a right to do it without your permission. Right? Well, that's the essence of it. But here's the major issue. And they want you to go through some other hoops, and you're not willing to do it. Exactly. What the defendants are doing is what the agency in Wyeth v. Levine did in 555, U.S. 555. They asserted Federal Is that case in the brief somewhere? It is. They asserted Federal supremacy just because they say so, without any clear direction from Congress. All of the laws at issue in this case, the Wilderness Act, the National Forest Act, all of those laws, even their own regulations, have savings clauses that protect tombstones, longstanding preexisting rights, and it also provides in their own regulations that they cannot suspend or alter our special use permits without notice and an opportunity to be heard, which is something that highlights the significance of the conclusory decision of the lower court in that the lower court completely ignored, did not grapple with at all the irreparable harm of the interference with our sovereign interests under Kansas v. United States. Let me ask you about that, because as I understand it, you didn't acquire the rights to this until 1947. Is that true? By quick claim deed, the city of Tombstone received these rights. Right. The original holder was, I'm not sure how you pronounce it, Huachuca. Huachuca. If you can correct me. Huachuca, Your Honor. Huachuca. Thank you very much. So Huachuca has the rights from 1913 on. The city acquires it. Why wasn't the city acting in a proprietary capacity as opposed to a sovereign capacity when it acquired the rights? Because of the context. Well, at the time of the acquisition of the rights, you could make that case, except for. Let's start. Let's take it one step at a time. I mean, at that point, it seems to me you only acquired whatever the proprietary interest was, and it didn't transform it into a sovereign interest. If I may, Your Honor, the Supreme Court. Bring it to that point. If I may, Your Honor, you could make. I just want a yes, and then you can jump. Okay. Well, the answer is no, because the Supreme Court has specifically ruled in Brush v. Commissioner that maintaining a municipal water supply is an essential governmental function. Well, that's true. But, I mean, in terms of it. For example, a private company could maintain a water right and wouldn't have any implication at all in the Tenth Amendment. True? That would be true. All right. So you acquired the private company's right. Why does that give you any greater rights under the Tenth Amendment than the private company had? Because the Supreme Court said so in Brush v. Commissioner that the acquisition and distribution of the supply of water for the needs of the modern city involved the exercise of essential governmental functions. So the way to analyze that question is, if the city was contracting with a private entity for their water supply, that would indeed still be an essential governmental function, not the, you know, the private company's actions. That's not relevant to the Tenth Amendment. But the acquisition of a water supply, whether the city runs it or contracts for it, is an essential governmental function, which is why our sovereign interests are at stake. Let me ask you one more. I take your point. I'm only interrupting you because I want you to have time. The – I gather that it's a different exercise of sovereignty than, say, condemnation. Not according to the U.S. Supreme Court. And, frankly – Do you think the character of a taking, a governmental taking, is different from acquiring a private right? When the U.S. Supreme Court declares that maintaining a water supply is an essential governmental function, I put it in the same category as any other essential governmental function. And in my – Go ahead with the rest of your argument. I don't want to take it. Thank you, Your Honor. But it's not simply the fact that they're trying to preserve a water supply, which is an essential governmental function, which the Supreme Court ruled that in a very real sense, without that supply, it would be equivalent to, quote, saying that the city itself would then disappear. So one of the highlights of this case is that we are dealing with the Alden v. Main limitation on the powers of the Federal Government, that of the guarantee which is implicit throughout the Constitution of the continued existence of the States. By virtue of the Forest Service's agency action, not based on any clear command of the Congress, they are threatening the continued existence of the city of Tombstone, and they are impairing its sovereign interests. And the lower court never grappled with that argument, did not even mention it, did not even address the case law that we advanced under it, and neither, in any meaningful sense, has defendants to this day. And here's why it's relevant. What Kansas v. United States says, that when sovereign interests are impaired, that is irreparable harm unless there is notice and opportunity to be heard. We know that there has never been notice and an opportunity to be heard with respect to any retraction of the 1916 letter determination recognizing these longstanding 1866 Mining Act rights. We know that there has never been any notice and opportunity to be heard with respect to a partial or any suspension or modification of the 1962 Special Use Permit. Under Kansas v. United States, we have irreparable harm clearly in the lower court by ignoring that point, committed clear reversible error in its conclusory decision, which warrants reversal. But furthermore, Your Honor, as I see my time is rapidly dwindling, I'd like to just at this stage and to issue the injunction that we requested below. And I would like to be very clear what it is that we're asking. We are asking that the City of Tombstone be allowed to freely and fully restore its municipal water supply to the original specifications as specifically identified at pages 50 and 51 of the appellant's brief. We have specific record references to the maps and surveys that detail in precise location where our water rights of way have been. And at the very least, Your Honors, let us restore all of the springs and all of the infrastructure that is in the 1962 Special Use Permit, which has never been suspended or revoked or denied by the defendants. All right, counsel, here's my problem. We've heard from the Forest Service that the two pending requests for approval were granted. What is it that the Forest Service has denied you that is in issue at the moment? The restoration of the remaining 23 springs. Have you applied for approval to do that? Your Honor, we believe that we have on December 5, 2011, and you can look at ER 120, and you can see that we made that application. And has the Forest Service ruled on that application? The Forest Service has ignored it. And that, by virtue of the state of emergency and the fact that we have the continued existence of the city of Tombstone at stake, is enough to injure us constitutionally under Alden v. Maine. Certainly the risk to our continued existence is as great as the threat of litigation was in Alden v. Maine. I understand what you're asking for at this point, but why is this not unlike what Arizona has asked when they've gotten slapped down by the Supreme Court on immigration issues? I think it's, you're asking us to go where no one's ever gone, and I see you shaking your head yes. And why wouldn't the Supreme Court just be really interested in this, and why wouldn't they do the exact same thing that they've done with Arizona and their immigration efforts? Respectfully, Your Honor, I'm shaking because this is a fascinating case, and it is an interesting case. But what's different about the property clause and the authority that deals with naturalization and immigration is that in CLEPI, the Supreme Court emphasized that there is concurrent jurisdiction over Federal property within the boundaries of the State, and that concurrent jurisdiction is analyzed under a standard preemption analysis. And when we're dealing with agency action that is not based on any clear command of Congress, there is a Federalism rule of construction that requires that agency action to defer to significant sovereign interests of the State, which is the exact opposite. Twelve months of delay involves in refusing even the restoration of the six springs that are covered by our special use plan. Has ripeness ever been raised in this case? Because it strikes me that if you filed on December 5th, 2011, for the approval of what you plan to do here, and the Forest Service has never ruled on it, I'm not sure that there's much to talk about at this stage, given that it's a preliminary injunction. You may have merits in the main case, but until the Forest Service has denied your access, what's there to talk about? Respectfully, I see a stoplight yet time running. Keep going. We're fascinated by this case. Well, Your Honor, the reason why there's no ripeness issue here is that the hindrance itself, the denial of full and free access in and of itself, even for a day, is what causes us injury under the Tenth Amendment. That threatens our continued existence. Very well. Thank you, Your Honor. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Thomas, Callahan